[Civil No. 3632.  Filed June 26, 1935.]

[46 Pac. (2d) 652.]

THAD M. MOORE, as a Member of the Arizona State Tax Commission, and as Assignee of Frank Luke and D. C. O'Neil, Petitioner, v. ANA FROHMILLER, Respondent.

Mr. Emmet M. Barry, for Petitioner.

Mr. John L. Sullivan, Attorney General, and Mr. Dudley W. Windes, Assistant Attorney General, for Respondent.

LOCKWOOD, C. J.—Thad M. Moore, herinafter called petitioner, filed in this court an original petition for a writ of *mandamus* against Ana Frohmiller, as state auditor, hereinafter called respondent, to compel her to issue certain salary warrants to him in his own right as a member of the state tax commission and as assignee of Frank Luke and D. C. O'Neil, the other members of the commission. Respondent demurred to the petition, and the question before us is whether upon the facts set forth in the petition the writ should issue. These facts may be briefly stated as follows:

The state tax commission exists by virtue of section 3056, Revised Code 1928, which section is, in substance, a re-enactment of sections 4820–4822, Revised Statutes 1913, Civil Code, and reads as follows:

"§ 3056. *Creation; Members; Qualifications; Election Terms.* There is created the state tax commission, composed of three members who shall possess knowledge and experience in the subject of taxation, and shall have been residents of Arizona for not less than five years prior to their election or appointment. One member shall be elected every two years, at the general election, for a term of six years, beginning the first day of January following. The names of all candidates for the office shall be placed on the ballot without partisan or other designation, except the title to the office. The member having the shortest time to serve, and not holding his office by appointment or by election to fill a vacancy, shall be chairman of the commission. No member shall hold any other public office or position of trust or profit, engage in any other occupation or business interfering or inconsistent with his duties, or serve on or under any committee of any political party, and each shall devote his entire time to the duties of his office."

Petitioner and Frank Luke, one of petitioner's assignors, were elected as members of the commission at the general election in 1932, and qualified and took office on the 1st day of January, 1933. D. C. O'Neil, petitioner's other assignor, was elected as a commissioner at the general election in November, 1934, and took office on the 1st day of January, 1935. At the time of the election of petitioner, as aforesaid, the salary of the Arizona tax commission was fixed by the provisions of section 1, chapter 5, 5th Special Session of the Eighth Legislature, which section reads, so far as material, as follows:

"Section 1. From and after the first Monday in January, 1929, the hereinafter named public officers shall receive and be paid each the following salaries per annum. . . . The members of the Tax Commission each forty-five hundred dollars. . . . "

Thereafter the Eleventh Legislature at its regular session in the spring of 1933 adopted chapter 41, which reads, so far as material, as follows:

"Relating to salaries of public officers, and amending sec. 2791, Revised Code of 1928, and acts amendatory thereof.

"Be it Enacted by the Legislature of the State of Arizona:

"Section 1. Sec. 2791, Revised Code of 1928, is hereby amended to read as follows:

"Sec. 2791. *Salaries of State Officers.* Beginning the first Monday in January, 1935, state officers shall receive the following annual salaries: . . . state mine inspector, members of the corporation commission, members of the tax commission, three thousand six hundred dollars each; . . . "

This act was approved by the Governor on March 14th and became law in June of the same year. Petitioner and his assignors duly filed with the respondent salary claims for the months of January, February and March, 1935, at the rate of $4,500 per year,

but she declined to pay the claims at that rate, except
for the period from the 1st to the 7th day of January,
allowing salary for the remainder of the period for
which the claims were filed at the rate of $3,600 per
year only.

It was and is the contention of petitioner that, by
reason of the provisions of article 4, section 17, of
the Constitution of Arizona, the change in salary of
the tax commissioners made by the legislature in
chapter 41, *supra,* does not become effective as to
himself or his assignors until the first commissioner
elected after the first Monday in January, 1935, takes
office. It was the position of respondent that the
chapter took effect as to all of the commissioners
when the commissioner elected at the general election
in 1934 took office. The correctness of either one of
these contentions is determined by the proper inter-
pretation of article 4, section 17, of the Constitution
of Arizona, as amended in 1930 (see Laws 1931, p.
491), which reads as follows:

"Section 17. The legislature shall never grant any
extra compensation to any public officer, agent, ser-
vant, or contractor, after the services shall have been
rendered or the contract entered into, nor shall the
compensation of any public officer be increased or
diminished during his term of office, provided, how-
ever, that when any legislative increase or decrease
in the compensation of the members of any court,
board, or commission, composed of two or more offi-
cers or persons, whose respective terms of office are
not coterminous, has heretofore or shall hereafter
become effective as to any member of such court,
board, or commission, it shall be effective from such
date as to each of the members thereof."

Briefly stated, the argument of petitioner is that
chapter 41, *supra,* by its terms expressly provides
that the salaries fixed therein should not commence
until the first Monday in January, 1935, which was

the 7th day of that month, and, since the commissioner elected at the general election in 1934 took office on the 1st day of January, six days before the change in salaries took effect, to compel him and his colleagues to accept the lower salary would violate the provisions of article 4, section 17, *supra,* as being a diminishing of the salary of a public officer during his term of office.

It is the position of respondent, on the other hand, that, since chapter 41, *supra,* became law in June, 1933, the new salaries of petitioner and his associates were fixed on that date, though they did not go into effect until January 7, 1935.

■■ Petitioner in his brief has stated that there are four questions involved: (1) Is *mandamus* a proper remedy in a case of this kind? (2) Are members of the tax commission public officers? (3) Is it necessary that the legislature make a special appropriation sufficient to pay the salaries of the tax commissioners at the higher rate? (4) Does chapter 41, *supra,* operate so as to reduce the salaries of the present members of the tax commission beginning January 7, 1935? So far as the first three questions are concerned, we answer the first two unhesitatingly in the affirmative. *Mandamus* is undoubtedly the proper remedy to compel the auditor to issue a warrant for salaries of state officers due if, as a matter of law, they should be paid (*Winsor* v. *Hunt,* 29 Ariz. 504, 243 Pac. 407), and members of the state tax commission are undoubtedly public officers to the same extent as are the Governor and the members of this court. The only difference is that their office is established by statute, while ours is constitutional in its nature, but this can have no effect upon the question involved.

If petitioner is entitled to the salary which he claims, while it is customary for the legislature to make appropriations for the salaries of state officers, it is not necessary, in order that they be paid, when the office is for a definite term and the amount of the salary is fixed by law or the Constitution. *Windes* v. *Frohmiller,* 38 Ariz. 557, 3 Pac. (2d) 275; *Crawford* v. *Hunt et al.,* 41 Ariz. 229, 17 Pac. (2d) 802. But, when we come to the fourth question, the matter is one of more difficulty. Counsel have not cited to us any cases directly in point, nor have we been able to find one by an independent investigation. Indeed, only two cases have been suggested to us which bear, even inferentially, upon the issue involved. These cases are *Yuma County* v. *Sturges,* 15 Ariz. 538, 140 Pac. 504, and *Castree* v. *Slingerland,* 139 Misc. 632, 248 N. Y. Supp. 746, 747.

In the case first cited the situation, briefly stated, was as follows: Sturges was elected as county treasurer of Yuma county on the 14th of February, 1912, his term expiring on the 31st of December, 1914. At that time the salaries of county treasurers were fixed by paragraphs 2608, 2609, 2610 and 2611, Revised Code 1901, as amended by the Session Laws of 1905. These sections, so far as material, read as follows:

"That for the purpose of fixing the compensation of county officers the counties of the territory are hereby divided into the following classes:

"1. Counties having an equalized assessed valuation of property of three million dollars or more, shall be counties of the first class.

"2. . . .

"3. . . .

"4. . . .

"5. . . .

"6. . . .

"County officers shall receive such compensation as is provided hereafter and none other. All salaries,

unless otherwise provided, shall be paid quarterly, at the end of each quarter; provided that in counties of the first class, the Boards of supervisors of said counties may by resolution provide that all salaries shall be paid monthly at the end of each month.

"The treasurers of the counties of the first class having an assessed valuation of nine million dollars and over in the territory of Arizona shall each receive a salary of twenty-five hundred dollars per annum.

"County treasurers shall receive, in counties of the first class, a salary of two thousand two hundred dollars per annum. . . . "

When the term of office of Sturges commenced, Yuma county was a county of the first class at an assessed valuation of more than $3,000,000, but less than $9,000,000. In August, 1913, however, the state board of equalization, acting strictly in accord with the law, fixed the assessed valuation of Yuma county at the sum of $13,000,000. Sturges thereupon claimed salary for the remainder of his term at the rate of $2,500 per annum, instead of $2,200. In discussing the case, we laid down certain general principles in regard to the constitutional provision in question as follows:

"A public officer is entitled to the salary provided by law as an incident to the office. Unless the fundamental law places a limitation upon the law-making power, that power may regulate, alter, increase, or diminish the compensation of such an officer at any time.

"Having its basic idea in principles of the soundest public policy that a public officer should receive that compensation fixed by law without increase or diminution during his term of office, in other words, that compensation in the contemplation of the aspirant and the people when they elected him, the Constitution has placed an inhibition upon the law-making power in this language: 'The Legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor, after the services shall

have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office.' Article 4, § 17, Constitution of Arizona. When the salaries or compensation of public officers have been definitely fixed or prescribed by law, either by the Constitution of the state or by some statute made in pursuance thereof, the salary or compensation so prescribed may not be increased or diminished during the term of the officer.

"It is at once seen that the constitutional restriction is an abridgment of the law making power to either increase or diminish that compensation of the officer during his term, and which was prescribed for and as an incident to the office at the beginning of his term; that during his term of office the public officer enjoys exemption from legislative interference and control over the amount of his compensation, and at the same time has a curb put upon his activity in the direction of an increase of compensation, whether such activity be worthy or pernicious. In fine he may devote his attention to the performance of his official duties, unembarrassed by any feeling that his worth is being niggardly rewarded in money, and the offspring of such a feeling which usually moves in the direction of increased compensation. At the same time there is the counterpart which attends him with a security from the wretched thought that others may become imbued with the conviction that his stipend is much too large for one of his capacity, and thus move with the pruning hook by way of economy in the public funds, or that desire which might in time find congenial soil in the breast of a people desiring to get rid of an officer altogether, and to that end take away that compensation which he hath.

"The matter of paramount importance here, then, is to ascertain what compensation was fixed or prescribed by law when the term of office of the appellee commenced. . . . "

We held that Sturges was entitled to the increased salary stating that, when his term of office began, his

compensation was definitely fixed by law as being dependent upon certain contingencies which might arise thereafter, not by any action of the legislature, but by the automatic operation of the law adopted before the term of Sturges began, and that, when a law adopted before the term of a public officer commenced provided for an automatic change of salary in the middle of a term, it was not a violation of the constitutional provisions under consideration. Petitioner argues, however, that, because the legislature did not expressly state that the $4,500 salary should continue only until the first Monday in January, and thereafter be changed to $3,600 but contented itself with the mere statement that after such date it should be $3,600, chapter 41, *supra,* did not become effective as a law until after the term of office of one of his assignors had commenced, and therefore was in reality the same as a law passed by the legislature after such term had commenced. The argument is a plausible one, but we think that a little consideration of general principles of legislation and statutory interpretation and the place to which petitioner's argument would carry us, if followed to its logical conclusion, will show that it is not tenable.

In *Castree* v. *Slingerland, supra,* the board of supervisors had, as authorized by law, fixed the salary of coroners of Saratoga county from time to time up to December 24, 1929. Such salary was $1,000, but on that date a resolution was adopted to the effect that "commencing January 1, 1931, the salaries of the coroners of Saratoga County be fixed at Fifteen hundred Dollars a year." There were then two coroners in the county whose tenure of office was not coterminous, one Johnson was elected to that office in November, 1929, for a term commencing January 1, 1930, and Castree, who was elected in November 1930, for a term commencing January 1,

1931. The latter contended that he was entitled to salary at the increased rate. Slingerland, the treasurer of Saratoga county, refused to pay at such rate, on the theory that the two coroners must draw the same salary, and that, if he paid Johnson at the new rate, it would be a violation of a statutory and constitutional provision similar to article 4, section 17, *supra*. The court said:

" . . . The purpose of this law is not only to protect the public against the evil of permitting a public official to use his official power and prestige to augment his own salary, but also to protect him against the equally unjust action of a reduction in his compensation by an unfriendly board having authority to fix the salary. This beneficent legislation removes from the lawmakers the temptation to control the other branches of government by promises of reward in the form of increased compensation or threat of punishment by way of reduced salaries. . . .

"It is true that under this resolution Dr. Johnson would receive a larger salary for the second and third years of his term than the first. *The action of the board of supervisors was taken, however, before the commencement of that term.* He did not assume office until January 1, 1930. The statute under consideration provides that the salary of an officer or employee elected or appointed for a definite term 'shall not be increased or diminished during such term.' The change in Dr. Johnson's salary was made before and not after he took office. . . . " (Italics ours.)

So, also, in *Rice* v. *National City*, 132 Cal. 354, 64 Pac. 580, 581, involving the effect of a salary change, it was said:

" . . . The object of the statute is to protect the incumbent against a reduction of compensation during his occupancy of the office, and also to take away all inducement to use his official influence and efforts to procure an increase of it during his incumbency; and in accepting the appointment Smith had a right

to rely upon the *compensation as then fixed, but which could not take effect until he entered upon a new term under his appointment. . . . "* (Italics ours.)

The question before us really is, Can the legislature by an act adopted *before* the term of office of an officer commences provide for a salary change to take effect *after* such term has commenced without violating article 4, section 17, *supra?* Taking into consideration the purpose of such constitutional provisions as they have been set forth in the above quotations, we think there is no doubt that it is within the power of the legislature to do so; the only question being as to whether it has exercised that power in a constitutional manner. Petitioner in his brief admits that, if the legislature in chapter 41, *supra,* had used the language "until the 7th day of January 1935, the salaries of the members of the tax commission shall continue, as at present, at $4,500.00 per annum, but shall thereafter be $3,600.00 per annum," his position in this action would be untenable. There can be no possible doubt that it was the intention of the legislature by chapter 41, *supra,* to accomplish that very result, and we think the only logical and reasonable construction to put upon the chapter, if as we have invariably held, the clear intent of the legislature is to prevail, is that they have, as a matter of law, done that very thing. Such a construction certainly violates no moral rights of petitioner.

When the legislature adopted chapter 41, *supra,* in March, 1933, it gave notice to all prospective candidates for office at the ensuing general election that from and after the first Monday in January there would be a general salary reduction, and that the salaries of the members of the tax commission would be reduced to $3,600 per annum. When petitioner's assignor O'Neil, therefore, became a candidate for office, it was with full knowledge of the situation, and

he was in no position to contend that he was deprived of a salary which he had the moral right to expect was annexed to the office. Petitioner and his other assignor, Luke, were also advised by the provisions of article 4, section 17, *supra,* that, since the salary of the commissioner to be elected in November, 1934, would be reduced on the 7th of January, 1935, their salaries would receive the same reduction. We are of the opinion that the effect of chapter 41, *supra,* was to create a situation similar in principle to, though differing in form from, that which arose in *Yuma County* v. *Sturges, supra;* that is, that it provided for an automatic change in salary to take effect at a future fixed time instead of, as in the case just cited, upon the happening of a future possible contingency, and just as in that case we held that an increase in salary through the automatic operation of a law which had been adopted before Sturges took office did not violate the constitutional provision, so we think that in the present case the automatic operation of a law adopted before O'Neil took office, which caused a reduction in his salary thereafter, would not violate the same constitutional provision. Since petitioner admits that, if the salary of his assignor O'Neil was legally changed on the 7th day of January, 1935, the salary of himself and Luke would also by virtue of the constitutional provision above referred to automatically change to the same degree, the petition for the alternative writ heretofore issued is ordered quashed.

McALISTER and ROSS, JJ., concur.